## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Kim Miller**<br>11 Castle Cliff Court<br>Silver Spring, MD 20904<br><br>         *Plaintiff*,<br><br>v.<br><br>**Citibank, N.A.**<br>         Serve:  The Corporation Trust,<br>                     Incorporated<br>                     2405 York Road, Suite 201<br>                     Lutherville-Timonium,<br>                     MD 21093<br><br>         *Defendant*. | Case No.:_____<br><br>***JURY TRIAL DEMANDED*** |

## COMPLAINT AND JURY DEMAND

Comes now the Plaintiff, by and through undersigned counsel, and sues the above-named Defendant, stating the cause as follows:

## JURISDICTION AND VENUE

1) This Court possesses jurisdiction pursuant to 28 U.S.C. § 1331, as this is a civil action arising under the Constitution, laws, or treaties of the United States.

2) Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), as the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

3) Plaintiff Kim Miller filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission on or about December 1, 2021.  *See* Exhibit A ("Charge of Discrimination").  On or about December 22, 2022, Ms. Miller received notice of her right to sue, which notice had been dated August 17, 2022 but not received until December 22, 2022.

*See* Exhibit B ("Right to Sue Notice for Kim Miller"). All conditions precedent for this lawsuit have been met.

## PARTIES

4) Plaintiff Kim Miller ("Ms. Miller") is an adult resident of Montgomery County, Maryland.

5) Defendant Citibank, N.A. ("Citibank") is a *sui juris* corporate entity, with the power to sue and be sued, with principal offices at 399 Park Avenue, New York, NY 10043. At all times relevant to the occurrences complained of elsewhere herein, Defendant Citibank was the owner and operator of the Citibank Bethesda branch office, located at 8001 Wisconsin Avenue, Bethesda, MD 20814. Also at all times relevant to the occurrences complained of elsewhere herein, Defendant Citibank was the employer of William Mayberry, Lisa Naymik, and Vanessa Ryan, among others, and is liable for their conduct on the basis of *respondeat superior* and applicable federal and state law.

## FACTS COMMON TO ALL COUNTSS

6) On or about May 9, 2016, Plaintiff Ms. Miller was hired by Defendant Citibank to the role of Branch Manager/Vice President for Defendant Citibank's Bethesda branch, located in Bethesda, Maryland.

7) Ms. Miller is Black/African American with respect to race, female with respect to sex, and thus a member of various protected classes.

8) Ms. Miller was born on January 8, 1957, and was 59 years old when she began her employment with Defendant Citibank in or about May 2016. Accordingly, at all times relevant to the occurrences complained of elsewhere herein, Ms. Miller was over the age of 40.

9) At all times relevant to the occurrences complained of elsewhere herein, Ms. Miller's performance as an employee was beyond satisfactory.

10) When Ms. Miller was first hired by Defendant Citibank, she was under the supervision of Area Director Paulette Sibblies-Flagg ("Sibblies-Flagg"). Ms. Miller had no performance or disciplinary issues while under the supervision of Sibblies-Flagg.

11) In or about January 2017, Sibblies-Flagg was replaced in the role of Area Director by Defendant Citibank's supervisory employee Lisa Naymik ("Naymik"), a Caucasian woman. When Naymik replaced Sibblies-Flagg, Naymik became Ms. Miller's supervisor and Naymik was thus employed as a supervisory employee for Defendant Citibank.

12) Naymik treated her African American and non-African American employees disparately. Naymik was known to conduct routine check-ins with non-African American branch managers to provide positive feedback and guidance. Naymik did not provide such positive feedback and guidance to Ms. Miller, who is African American, nor did she provide such positive feedback and guidance to other African American branch managers.

13) Some non-African American branch managers to whom Naymik provided routine guidance included, but were not limited to, Jessica Alvarez, a Hispanic branch manager, Angela Rodriguez, also Hispanic, Svetlana Jenko, a Ukrainian branch manager, and William Mayberry, a Caucasian branch manager.

14) In contrast to the routine guidance Naymik gave non-African American branch managers, Naymik only visited Ms. Miller at the Bethesda branch when Naymik was there to allege problems at the branch and to discipline or punish Ms. Miller. Witnesses to this disparate treatment of Ms. Miller relative non-African American branch managers include, but are not

limited to, branch manager Tyeesha Shaw ("Shaw"), branch manager Sean Headley ("Headley"), teller Laura Lanza ("Lanza"), and teller Tyese Branch ("Branch").

15) Shaw, also African American, managed a branch in Mitchellville, a predominantly African American neighborhood in Maryland. Naymik rarely visited Shaw's branch. On information and belief, Naymik rarely visited Shaw's branch because Shaw was African American and because Shaw's branch was in a predominantly African American neighborhood.

16) Headley, also African American, managed a branch in East River Park, another predominantly African American neighborhood, this one in D.C. Headley's branch also rarely received visits from Naymik. On information and belief, Naymik rarely visited Headley's branch because Headley was African American and his branch was located in a predominantly African American community.

17) Naymik not only treated African American branch managers differently than non-African American branch managers, she also treated African American clients differently than non-African American clients. For example, in or about September 2020, Naymik insisted an African American client with special needs stop coming to the Bethesda branch and that he take his banking needs elsewhere because he had no funds in the bank and Naymik alleged he was disruptive. In contrast, a Caucasian client named Claudia Bocock ("Bocock") called a Ghanaian client of the bank a "nigger" while in the Bethesda branch and stated that the Ghanaian client should "go back to Africa." When Naymik learned of the incident, she took no action against the Caucasian Bocock.

18) In or about March 2020, Naymik met with Ms. Miller and told Ms. Miller she would be placed on a performance improvement plan ("PIP"). When Naymik placed Ms. Miller

on a PIP, Ms. Miller suffered an adverse employment action. Naymik alleged that the reason Ms. Miller would be placed on a PIP was because Ms. Miller's branch had two consecutive branch compliance assessments ("BCA") where the branch was rated "Effective/Low" in 2019.

19) Ms. Miller stated to Naymik that she disagreed with the adverse employment action of being placed on a PIP. Ms. Miller noted to Naymik that "Effective/Low" scores were passing scores, and that the Bethesda branch had experienced significant issues related to staffing in 2019. For example, the personal banker who carried approximately 40% of the branch's book of business, Uzair Ahmad ("Ahmad"), departed to another branch in Florida in December 2018, significantly impacting the branch's 2019 performance. The Citigold Relationship Manager Stephanie Chak also left the branch in April 2019, leaving the branch further short-staffed. At times during 2019, Ms. Miller was left to work the platform of the branch completely by herself. Despite these challenges, Ms. Miller's branch achieved passing BCA scores.

20) Naymik placed Ms. Miller on a PIP allegedly because Ms. Miller's branch had received Effective/Low BCA scores. When Ms. Miller asked other branch managers whether it was standard to be placed on a PIP for receiving an Effective/Low BCA score, she was told no. Branch managers who told Ms. Miller that placing someone on a PIP for Effective/Low BCA scores was not standard practice include, but are not limited to, Shaw and Headley.

21) In contrast to Ms. Miller, Non-African American branch managers with low BCA scores were not placed on PIPs. For example, Rick Remson ("Remson"), a similarly situated Caucasian branch manager under the age of 40, received a failing BCA score but was not placed on a PIP by Defendant Citibank.

22) David Rivera ("Rivera"), a similarly situated Hispanic branch manager under the age of 40, oversaw a branch which failed an audit and where major errors were uncovered. On

information and belief, Rivera was not put on a PIP due to these errors but instead only received verbal feedback from Naymik.

23) In contrast to Naymik's treatment of non-African American branch managers, Ms. Miller, an African American over the age of 40, was placed on a PIP by Naymik for receiving passing scores on her BCAs. Naymik's claim that Ms. Miller's passing BCA scores necessitated a PIP was a pretext to disguise the discriminatory animus that actually motivated the PIP, namely Naymik's discriminatory animus on the basis of race and age against Ms. Miller.

24) Though the PIP was unjust, Ms. Miller satisfied the PIP after 90 days.

25) In or about August 2020, personal banker Ronald Diaz ("Diaz") was fired from the Bethesda branch after an investigation revealed he was opening accounts and taking credit card applications over the phone when doing so was not authorized for Defendant Citibank's employees.

26) Prior to Diaz being fired, Diaz had requested a modification of his entitlements from Ms. Miller. Entitlements are the authority bankers receive to perform particular functions within Defendant Citibank's banking system. Ms. Miller felt this request was unusual, as she had never received a similar request from another personal banker. Additionally, Ms. Miller had previously had to correct Diaz for using his DocuSign privileges in a manner inconsistent with company policy.

27) In light of the prior correction regarding his use of Docusign, and Because of Diaz's unusual request to modify his entitlements, Ms. Miller escalated the matter and notified Naymik of Diaz's request. When Ms. Miller notified Naymik, Naymik informed Ms. Miller that Diaz was being investigated and then instructed Ms. Miller not to inform Diaz of the termination

6

or engage in any conduct that would make him aware that the bank knew of his potential misconduct.

28) After Diaz was fired on the basis of the bank's investigation, Naymik used Diaz's misconduct as a pretext to place Ms. Miller on a second PIP. Naymik alleged a second PIP was necessitated because Ms. Miller failed to monitor Diaz sufficiently to identify his continuing misconduct after she had corrected Diaz regarding the DocuSign issue.

29) The allegation that Ms. Miller had failed to continue to monitor Diaz after the DocuSign correction was false, and Ms. Miller had flagged Diaz's later request for modified entitlements and escalated the matter by notifying Naymik. Naymik ordered Ms. Miller to do nothing and then placed Ms. Miller on a PIP for following Naymik's direct instruction.

30) Naymik used Diaz's misconduct as an excuse to place Ms. Miller on a second PIP, because, under Defendant Citibank's personnel policies, a second PIP constituted a Final Corrective Action. A Final Corrective Action meant any additional infraction could result in termination. Driven by discriminatory animus against Ms. Miller's race and age, Naymik was establishing the prerequisites for terminating Ms. Miller on account of her race and age.

31) On information and belief, no other branch manager had ever been placed on a PIP for the actions of another employee.

32) Despite this second PIP being unjust, Ms. Miller satisfied the PIP after 90 days.

33) On or about December 30, 2020, Ms. Miller completed and submitted her branch's Review Responsibility Worksheet to supervisory employee Vanessa Ryan ("Ryan"), Defendant Citibank's Operations Manager.

34) After the Review Responsibility Worksheet was submitted, Ryan questioned Ms. Miller regarding whether one of the items on the worksheet, the Blank Debit Card

Reconciliation, had been completed. This reconciliation was a dual function task, requiring two employees to complete. Both employees who complete a dual function task are supposed to be noted on the Review Responsibility Worksheet. Ms. Miller had completed this task with teller Laura Lanza ("Ms. Lanza"). Ms. Miller's initials were indicated on the worksheet for having completed this reconciliation task but Ms. Lanza's were inadvertently left off.

35) Because it was standard practice for employees to correct information on Review Responsibility Worksheets when inaccuracies were discovered, Ms. Miller updated the Blank Debit Card Reconciliation item with Lanza's initials and sent the document back to Ryan. In past instances where similar bank documents had been inadvertently left partially incomplete, Ryan had ordered Ms. Miller to add in the missing initials or names of other employees in order to complete the documents after the fact.

36) Additionally, other employees had previously been asked or allowed to update Review Responsibility Worksheets after the fact, including, but not limited to, Ivonne Cones ("Cones"), a Hispanic personal banker, and Mariam Hammadi ("Hammadi"), a Hispanic teller. Cones was even ordered by Ryan to sign off on an item Cones told Ryan she had not actually completed in approximately March 2020. Ryan ordered Ms. Miller via email to order Cones nonetheless sign off on the item, a falsification of an official bank record knowingly demanded by a supervisory employee.

37) Though it was common practice in the branches to update or correct internal bank documents after the fact, even with the initials or names of other employees, and with the knowledge of supervisory employees such as Ryan, Naymik and/or Ryan opened an investigation into Ms. Miller for Ms. Miller having corrected the December 2020 Review Responsibility Worksheet with Lanza's initials.

38)     This investigation began in or about March 2021, shortly after Ms. Miller had told Naymik that she planned to retire in the following calendar year.  On information and belief, Naymik sought to see Ms. Miller terminated out of animus towards Ms. Miller's race and age, rather than let Ms. Miller retire on her own terms.

39)     Naymik and/or Ryan had Ms. Miller investigated by Defendant Citibank's Citi Security and Investigative Services ("CSIS") for allegedly committing fraud, even though non-African American employees such as Cones and Hammadi were allowed to update and/or correct Review Responsibility Worksheets after the fact without punishment and were even ordered to do so falsely by supervisory employee Ryan without being subjected to security investigations.

40)     On May 3, 2021, Defendant Citibank's CSIS held a Zoom meeting with Ms. Miller to discuss the correction of the December 2020 Review Responsibility Worksheet.  At this meeting, Ms. Miller stated to CSIS that she felt she was being targeted.

41)     The reason Ms. Miller felt she was being targeted was that non-African American employees also routinely corrected Review Responsibility Worksheets after the fact, even at the behest of supervisory employees, and were never investigated by CSIS.

42)     At this Zoom meeting, Ms. Miller asked when CSIS expected the investigation to conclude.  The CSIS officials on the Zoom stated that Ms. Miller would be provided the findings of the investigation after the matter was referred to Defendant Citibank's Ethics Committee.  Upon hearing this, Ms. Miller again noted that she was being targeted since the issues under investigation routinely occurred at the bank without security investigations, let alone referrals to the Ethics Committee.

43) After this Zoom meeting, the stress of being investigated on account of her race for routine conduct that in the past was even ordered by Defendant Citibank's own supervisory employees caused Ms. Miller to take FMLA medical leave.

44) While Ms. Miller was on FMLA medical leave, Naymik set up a phone call with Ms. Miller on the pretext that they would discuss items that needed to be handled by others during Ms. Miller's leave.  When Ms. Miller and Naymik had their call, Naymik indicated that Ryan was also on the line.  Ryan then interrogated Ms. Miller for approximately 45 minutes regarding the December 2020 Review Responsibility Worksheet.  Ms. Miller was blindsided by this interrogation.  When the interrogation ended, Ms. Miller suffered a panic attack as a result of the interrogation.

45) In or about June 2021, Ms. Miller's branch received another BCA and earned an almost perfect score.  Ms. Miller had maintained the performance of the branch despite being subjected to treatment so unfair it was causing her panic attacks at the time.  Accordingly, Ms. Miller's job performance was beyond satisfactory.

46) On or about July 8, 2021, Ms. Miller was unjustly terminated by Defendant Citibank from her position of Branch Manager/Vice President of the Bethesda branch.  Naymik informed Ms. Miller of her termination and stated it was related to Defendant Citibank's investigation of the correction to the December 2020 Review Responsibility Worksheet but never gave Ms. Miller an actual cause for her firing.

47) Naymik announced Ms. Miller's termination within earshot of one of Ms. Miller's team members, utterly humiliating Ms. Miller.

48) When Naymik humiliatingly fired Ms. Miller, Ms. Miller had been working in the banking industry for 40 years and had never had an ethical complaint or disciplinary issue. Now, Ms. Miller was being unceremoniously fired in front of her team member.

49) Ms. Miller was then made by Naymik to gather her personal belongings from her office in her bare hands. After Ms. Miller gathered her belongings, Naymik escorted Ms. Miller from the building as though Ms. Miller were a security threat. Naymik escorted Ms. Miller from the building while Ms. Miller carried all her personal items in her arms, without the benefit of so much as a box.

50) Non-African American branch managers who faced disciplinary termination from Defendant Citibank were not terminated in front of their teams and made to carry their personal belongings out in their bare hands while being perp walked out of the bank, but instead were allowed to resign in lieu of termination. This includes William Mayberry, a Caucasian branch manager who faced termination for making racially hostile remarks but was allowed to resign rather than be terminated. This also includes Angela Rodriguez, a Hispanic branch manager who faced termination for having an affair with a bank customer but was allowed to resign rather than be terminated.

51) In contrast, Ms. Miller was never given the option to resign in lieu of termination.

52) Non-African American employees who had been terminated by Defendant Citibank, including but not limited to Ronald Diaz, were terminated over the phone. In contrast, Ms. Miller was terminated in person and within earshot of her team members towards the close of business, after having worked the entire day.

53) After the unjust and humiliating termination of Ms. Miller, Defendant Citibank refused to return Ms. Miller's accrued vacation pay, allegedly on the basis that she was fired for cause.

54) Ms. Miller applied for unemployment after her termination and Defendant Citibank challenged her claim. Ms. Miller appealed and was granted unemployment because Defendant Citibank could not substantiate that Ms. Miller's firing was actually for cause.

55) As a direct and proximate result of Defendant Citibank's conduct, by and through its supervisory employees, Ms. Miller was caused to suffer economic and non-economic damages, including but not limited to, lost income, severe emotional anguish, the onset of panic attacks, increased anxiety, out of pocket therapy expenses, regular bouts of crying that continue to this day, difficulty sleeping, difficulty driving, loss of weight, loss of concentration, and humiliation.

## COUNT I
### (42 U.S.C. § 2000e *et seq*. – Title VII Discrimination)

56) Every paragraph falling outside this Count is incorporated herein by reference with the same effect as if fully stated herein.

57) Ms. Miller is Black/African American with respect to race and therefore a member of a protected class. Ms. Miller is also a woman with respect to sex and a member of a protected class.

58) At all times relevant to the occurrences complained of herein, Ms. Miller's job performance was more than satisfactory. In or about 2019, Ms. Miller achieved passing scores on her branch's BCA despite her branch being severely understaffed during the year. In or about June 2021, because Ms. Miller was performing beyond satisfactorily, Ms. Miller's branch achieved an almost perfect BCA score.

59) In March 2020, Ms. Miller suffered the unjust adverse employment action of being placed on a PIP for achieving passing BCA scores in 2019. No non-African American branch manager for Defendant Citibank has ever been placed on a PIP for a passing BCA score. Additionally, non-African American bank managers whose branches received failing BCA scores were not placed on PIPs. Non-African American bank managers with failing BCA scores who were not placed on PIPs include but are not limited to Rick Remson and David Rivera.

60) In or about August 2020, Ms. Miller suffered the unjust adverse employment action of being placed on a second PIP and receiving a Final Corrective Action. Ms. Miller was placed on this second PIP because an employee at her branch was found to have violated Defendant Citibank's policies. No non-African American branch manager has been placed on a PIP by Defendant Citibank for the actions of another employee.

61) On or about July 8, 2021, Ms. Miller suffered the unjust adverse employment action of being terminated. Ms. Miller was allegedly terminated for amending a Review Responsibility Worksheet for accuracy after the fact. Amending Review Responsibility Worksheets after the fact was a task Ms. Miller had in past instances been ordered to carry out by Defendant Citibank's supervisory employee Vanessa Ryan.

62) Non-African American employees had previously been asked or allowed to update Review Responsibility Worksheets after the fact without being terminated. Non-African American employees allowed to amend Review Responsibility Worksheets after the fact and without consequence include but are not limited to Ivonne Cones ("Cones"), a Hispanic personal banker, and Mariam Hammadi ("Hammadi"), a Hispanic teller. In or about March 2020, Ryan even ordered Ms. Miller to order Cones to sign off on an item Cones had not actually completed without consequence.

63) On or about July 8, 2021, Ms. Miller was terminated for falsely alleged misconduct in front of her entire team and escorted from the branch while carrying all her office belongings in her bare hands.  Ms. Miller was never offered the opportunity to resign in lieu of termination.  Non-African American managers facing termination for actual misconduct were allowed to resign in lieu of termination, including but not limited to William Mayberry and Angela Rodriguez.

64) As a direct and proximate result of Defendant Citibank's conduct, by and through its supervisory employees, Ms. Miller was caused to suffer economic and non-economic damages, including but not limited to, lost income, severe emotional distress and anguish, the onset of panic attacks, increased anxiety, out of pocket therapy expenses, regular bouts of crying that continue to this day, difficulty sleeping, difficulty driving, loss of weight, loss of concentration, and humiliation.

Wherefore, Plaintiff demands judgment against Defendant Citibank in an amount to be determined by a jury at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, as well as punitive damages, plus any declaratory and injunctive relief to which Plaintiff may be entitled.

## COUNT II
**(42 U.S.C. § 2000e *et seq*. – Title VII Retaliation)**.

65) Every paragraph falling outside this Count is incorporated herein by reference with the same effect as if fully stated herein.

66) On May 3, 2021, Defendant Citibank's CSIS team held a Zoom meeting with Ms. Miller to discuss the correction of the December 2020 Review Responsibility Worksheet.  At this meeting, Ms. Miller pointed out that she was being targeted in being investigated by CSIS.  Ms. Miller felt targeted because non-African American employees also routinely corrected Review

Responsibility Worksheets after the fact, even at the behest of supervisory employees, and were never investigated by CSIS.

67)	At this Zoom meeting, Ms. Miller asked when CSIS expected the investigation to conclude.  The CSIS officials on the Zoom stated that Ms. Miller would be provided the findings of the investigation after the matter was referred to Defendant Citibank's Ethics Committee.  Upon hearing this, Ms. Miller again noted that she was being targeted since the issues under investigation routinely occurred at the bank without security investigations, let alone referrals to the Ethics Committee.

68)	Only two months after Ms. Miller complained of being targeted to Defendant Citibank's CSIS team, the CSIS team had Ms. Miller terminated for conduct routinely engaged in by other Defendant Citibank employees and supervisors.

69)	As a direct and proximate result of Defendant Citibank's conduct, by and through its supervisory employees, Ms. Miller was caused to suffer economic and non-economic damages, including but not limited to, lost income, severe emotional distress and anguish, the onset of panic attacks, increased anxiety, out of pocket therapy expenses, regular bouts of crying that continue to this day, difficulty sleeping, difficulty driving, loss of weight, loss of concentration, and humiliation.

Wherefore, Plaintiff demands judgment against Defendant Citibank in an amount to be determined by a jury at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, as well as punitive damages, plus any declaratory and injunctive relief to which Plaintiff may be entitled.

### COUNT III
**(ADEA Discrimination)**.

70) Every paragraph falling outside this Count is incorporated herein by reference with the same effect as if fully stated herein.

71) Ms. Miller was born on January 8, 1957, and was 59 years old when she began her employment with Defendant Citibank in or about May 2016. Accordingly, at all times relevant to the occurrences complained of elsewhere herein, Ms. Miller was over the age of 40 and protected by the Age Discrimination in Employment Act.

72) In March 2020, Ms. Miller suffered the unjust adverse employment action of being placed on a PIP for achieving passing BCA scores in 2019. No non-African American branch manager for Defendant Citibank has ever been placed on a PIP for a passing BCA score. Additionally, non-African American bank managers whose branches received failing BCA scores were not placed on PIPs. Non-African American bank managers with failing BCA scores who were not placed on PIPs include but are not limited to Rick Remson and David Rivera.

73) In or about August 2020, Ms. Miller suffered the unjust adverse employment action of being placed on a second PIP and receiving a Final Corrective Action. Ms. Miller was placed on this second PIP because an employee at her branch was found to have violated Defendant Citibank's policies. No non-African American branch manager has been placed on a PIP by Defendant Citibank for the actions of another employee.

74) On or about July 8, 2021, Ms. Miller suffered the unjust adverse employment action of being terminated. Ms. Miller was allegedly terminated for amending a Review Responsibility Worksheet for accuracy after the fact. Amending Review Responsibility Worksheets after the fact was a task Ms. Miller had in past instances been ordered to carry out by Defendant Citibank's supervisory employee Vanessa Ryan. Amending Review Responsibility

Worksheets after the fact had been done by non-African American employees without consequence.

75) At the time of all three adverse employment actions, Ms. Miller's job performance was more than satisfactory and at a level that met Defendant Citibank's legitimate expectations. In or about 2019, because of Ms. Miller's satisfactory job performance, Ms. Miller achieved passing scores on her branch's BCA despite being severely understaffed during the year. In or about June 2021, because of Ms. Miller's satisfactory job performance, Ms. Miller's branch achieved an almost perfect BCA score.

76) Ms. Miller was 64 at the time of her unjust termination. On information and belief, Ms. Miller was replaced by a substantially younger worker with comparable qualifications after she was unjustly terminated by Defendant Citibank.

77) As a direct and proximate result of Defendant Citibank's conduct, by and through its supervisory employees, Ms. Miller was caused to suffer economic and non-economic damages, including but not limited to, lost income, severe emotional distress and anguish, the onset of panic attacks, increased anxiety, out of pocket therapy expenses, regular bouts of crying that continue to this day, difficulty sleeping, difficulty driving, loss of weight, loss of concentration, and humiliation.

Wherefore, Plaintiff demands judgment against Defendant Citibank in an amount to be determined by a jury at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, as well as punitive damages, plus any declaratory and injunctive relief to which Plaintiff may be entitled.

## **COUNT IV**
### **(Breach of Contract)**

78) Every paragraph falling outside this Count is incorporated herein by reference with the same effect as if fully stated herein.

79) Defendant Citibank prohibits any form of unlawful discrimination or harassment in its "Unlawful Discrimination, Harassment and Retaliation Policy," contained in its Employee Handbook.

80) Defendant Citibank's Employee Handbook constitutes a contract between Ms. Miller and Defendant Citibank, establishing the policies that would govern the employment relationship between the parties.

81) Defendant Citibank breached this contract when it allowed Ms. Miller to be discriminated against unlawfully on account of her race by being placed on two unjust PIPs and then being unjustly terminated, as contrasted with Defendant Citibank's treatment of non-African American employees, as described elsewhere herein.

82) As a direct and proximate result of Defendant Citibank's conduct, by and through its supervisory employees, Ms. Miller was caused to suffer economic and non-economic damages, including but not limited to, lost income, severe emotional distress and anguish, the onset of panic attacks, increased anxiety, out of pocket therapy expenses, regular bouts of crying that continue to this day, difficulty sleeping, difficulty driving, loss of weight, loss of concentration, and humiliation.

Wherefore, Plaintiff demands judgment against Defendant Citibank in an amount to be determined by a jury at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, as well as punitive damages, plus any declaratory and injunctive relief to which Plaintiff may be entitled.

## **JURY DEMAND**

83) Plaintiff demands a trial by jury for all claims so triable.

                                                    Respectfully submitted,

                                                    The Cochran Firm-Hyattsville

                                                    /s/ *Charles Tucker Jr.*
                                                Charles Tucker Jr.
                                                8181 Professional Place, Suite 207
                                                Hyattsville, MD 20785
                                                T: (301) 577-1175
                                                F: (240) 467-5787
                                                charles@tuckerlawgroupllp.com
                                                *Counsel for Plaintiff*