## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

KIM MILLER,

    Plaintiff,

    v.

CITIBANK, N.A.,

    Defendant.

Civil Action No. TDC-23-0643

## MEMORANDUM OPINION

Plaintiff Kim Miller has filed a civil action against Defendant Citibank, N.A. ("Citibank") alleging race discrimination, age discrimination, unlawful retaliation, and a breach of contract arising from her termination from her position as a branch manager at a Citibank branch in Bethesda, Maryland. Citibank has filed an Amended Motion to Dismiss and Compel Arbitration, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED, and this case will be DISMISSED.

## BACKGROUND

### I.    Allegations of Discrimination and Retaliation

Plaintiff Kim Miller, a Black woman over the age of 40, worked as a vice president and branch manager at the Citibank branch in Bethesda, Maryland from May 9, 2016 to July 8, 2021. In her Complaint, Miller alleges that when Lisa Naymik, who is white, became the Area Director and Miller's supervisor in January 2017, Miller and other African American branch managers began to be treated differently from other branch managers. For example, Miller asserts that in

March 2020, Naymik placed Miller on a performance improvement plan ("PIP") because the Bethesda branch had received low ratings on two consecutive branch compliance assessments in 2019, which Miller attributed to the level of staff turnover that year. After inquiring of other branch managers, Miller learned that non-African American branch managers, including at least one under the age of 40, had not been placed on PIPs for the same level of ratings. In August 2020, Miller was placed on a second PIP for failing to monitor an employee after learning of his misconduct, even though she had reported it to Naymik, and Naymik had specifically told her not to take action or inform the employee that Citibank was aware of the misconduct.

Then, in December 2020, Miller updated a Review Responsibility Worksheet after the operations manager noted that it lacked the initials of the second employee who jointly completed a task. In March 2021, Citibank opened an investigation into the updating of the worksheet even though Miller understood such updating to be common practice. On May 3, 2021, during a Zoom meeting with Citibank's investigators to discuss the updating of the worksheet, Miller stated that she felt targeted because of her race. Miller then took leave pursuant to the Family and Medical Leave Act due to stress induced by the investigation.

Although Miller's branch received a high score on the June 2021 branch compliance assessment, Miller was terminated from her position on July 8, 2021. Miller alleges that she was humiliated when her termination was announced within earshot of another employee and when she, unlike others who were to be terminated, was not given the opportunity to resign and was therefore immediately escorted out of the branch in front of other employees.

## II.    The Arbitration Policy

During Miller's employment, Citibank had an Employment Arbitration Policy ("the Arbitration Policy") that was set forth in its employee handbook ("the Handbook"). The

Arbitration Policy stated, in part: "This Policy applies to both you and to Citi[bank], and makes arbitration the required and exclusive forum for the resolution of all employment-related disputes . . . between you and Citi[bank]." Arbitration Policy at 1, Mot. Dismiss Ex. B, ECF No. 27-3. The Arbitration Policy also stated:

> This Policy applies to both existing and future disputes, including any disputes based on conduct that occurred before this Policy. Subject to the remainder of this Section, these disputes include, without limitation, claims, demands or actions under Title VII of the Civil Rights Act of 1964 . . . the Age Discrimination in Employment Act of 1967 . . . and any other federal, state or local statute, regulation or common-law doctrine regarding employment, employment discrimination, the terms and conditions of employment, termination of employment, compensation, breach of contract, defamation, or retaliation . . . .

*Id.* at 1-2.

The Arbitration Policy further provided that "[t]he results of the arbitration are final and binding on you and Citi[bank]." *Id.* at 3. The Arbitration Policy also contained a section entitled "Amendment or termination of arbitration policy" which provided that:

> Citi[bank] reserves the right to revise, amend, modify, or discontinue the Policy at any time in its sole discretion with 30 calendar days' written notice. Such amendments may be made by publishing them in the Handbook or by separate release to employees and shall be effective 30 calendar days after such amendments are provided to employees and will apply prospectively only.

*Id.* at 6.

Early in her employment, on February 24, 2017, Miller electronically acknowledged receipt of Citibank's 2017 U.S. Employee Handbook. In the acknowledgment form, Miller accepted the following statement:

> I understand that the Employment Arbitration Policy, which is a standalone agreement contained in Appendix A, is a binding agreement between Citi[bank] and me. I understand that, except for the Arbitration Policy, nothing contained in the handbook, nor the handbook itself, is considered a contract of employment.

Arbitration Acknowledgment at 1, Mot. Dismiss Ex. A, ECF No. 27-2.

### III.    The Complaint

On March 8, 2023, Miller filed this civil action against Citibank in which she has alleged that her termination constituted race discrimination and unlawful retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2, 2000e-3(a) (2018); age discrimination, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a)(1) (2018); and a breach of contract. On March 27, 2023, Miller, through counsel, declined to provide her consent to proceed with arbitration of her claims.

## DISCUSSION

In its Amended Motion to Dismiss and Compel Arbitration, Citibank argues that: the Arbitration Policy and Miller's electronic acknowledgment of it (collectively, "the Arbitration Agreement") is a valid and enforceable contract that this Court is required to enforce pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16 (2018); that Miller's claims are subject to the arbitration requirement set forth in the Arbitration Agreement; and that the Court should therefore compel arbitration and dismiss this case. In opposing the Motion, Miller does not dispute that she accepted the Arbitration Agreement or that her claims would be subject to its requirement of mandatory arbitration. Rather, she asserts that the Arbitration Agreement is not a valid contract because it lacks consideration and because it is unconscionable; that Miller is in a category of employees exempt from the FAA's requirement that courts enforce arbitration agreements; and if the Court compels arbitration, it should stay the case rather than dismiss it.

### I.    Legal Standards

Judges in this District have recognized that "motions to compel arbitration exist in the netherworld between a motion to dismiss and a motion for summary judgment." *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 589 (D. Md. 2013) (quoting *Shaffer v. ACS Gov't*

4

*Servs., Inc.*, 321 F. Supp. 2d 682, 683 (D. Md. 2004)). Treating a motion to compel arbitration as a motion for summary judgment is proper where "the formation or validity of the arbitration agreement is in dispute." *Id.* Here, the Court will apply the summary judgment standard because the parties dispute whether an arbitration agreement was properly formed.

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

A request to compel arbitration is governed by the FAA, which provides that:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Upon a finding that an issue is "referable to arbitration under such an agreement," a court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." *Id.* § 3. Thus, a litigant in federal court may compel arbitration under the FAA upon a demonstration of: (1) the existence of a dispute

5

between the parties; (2) a written agreement that includes an arbitration provision that purports to cover the dispute; (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce; and (4) the failure, neglect, or refusal of the other party to arbitrate the dispute. *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991). Here, Miller disputes only the second of these elements.

In deciding whether such a valid arbitration agreement exists between the parties, the Court applies ordinary state law principles governing the formation of contracts. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). The parties do not dispute that Miller and Citibank entered into a contract in Maryland and that Maryland law applies in evaluating the issue of contract formation. *See Kramer v. Bally's Park Place, Inc.*, 535 A.2d 466, 467 (Md. 1988) (stating that "the law of the jurisdiction where the contract was made controls its validity and construction").

## II.    Consideration

The parties dispute whether the Arbitration Agreement is supported by adequate consideration. Agreements to arbitrate may be invalidated "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "To be binding and enforceable, contracts ordinarily require consideration" which, in Maryland, "may be established by showing a benefit to the promisor or a detriment to the promisee." *Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 835 A.2d 656, 661 (Md. 2003) (citations omitted). Consideration may take the form of "[f]orbearance to exercise a right or pursue a claim." *Id.* "A promise becomes consideration for another promise only when it constitutes a binding obligation. Without a binding obligation, sufficient consideration does not exist to support a legally enforceable agreement." *Id.* An illusory promise "appears to be a promise, but it does not actually bind or obligate the promisor to

anything." *Id.* at 662.  Because an illusory promise is not binding on the promisor, an illusory promise cannot provide consideration sufficient to support an enforceable contract. *Id.*

In *Cheek*, the Court of Appeals of Maryland, now the Supreme Court of Maryland ("the Maryland Supreme Court"), held that in determining whether there is adequate consideration for an arbitration clause or provision, a court may not rely on consideration underlying the overall contract, but instead must find specific consideration for the agreement to arbitrate itself. *Id.* at 667.  The court adopted this rule because, under Maryland law, an arbitration clause is "an independently enforceable contract" that is "a severable part of the contract." *Id.* at 664-65 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967)); *see FOP Lodge No. 4 v. Balt. Cnty.*, 57 A.3d 425, 432-33 (Md. 2012); *Holmes v. Coverall N. Am., Inc.*, 649 A.2d 365, 371 (Md. 1994) ("[A]n arbitration clause is severable from the entire contract.").  Such an approach prevents courts from impermissibly "'straying into the prohibited morass of the merits of the claims' by looking to the parties' obligations (and their potential breach) underlying the lawsuit itself." *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 607 (4th Cir. 2013) (quoting *Cheek*, 835 A.2d at 665).  Thus, in determining the validity of an arbitration clause in a contract, the provision "must be supported by consideration independent of the contract underlying it, namely, mutual obligation." *Id.* at 609.

Here, the Arbitration Agreement is supported by valid consideration.  The Arbitration Policy states that "[t]his Policy applies to both you and to Citi[bank], and makes arbitration the required and exclusive forum for the resolution of all employment-related disputes . . . between you and Citi[bank]."  Arbitration Policy at 1.  The Arbitration Policy further provides that "[t]he results of the arbitration process are final and binding on you and Citi[bank]." *Id.* at 3.  Further, when Miller electronically accepted the Arbitration Policy, she acknowledged that it "is a binding

agreement between Citi[bank] and me." Arbitration Acknowledgment at 1. Because the Arbitration Agreement required both Miller and Citibank, and not just Miller, to have any employment-related disputes resolved by arbitration, there is sufficient consideration. *See Cheek*, 835 A.2d at 665 (stating that "mutual promises to arbitrate act as 'an independently enforceable contract'" in that "each party has promised to arbitrate disputes arising from an underlying contract, and 'each promise provides consideration for the other'" (quoting *Holmes*, 649 A.2d at 370)).

Notably, the Arbitration Policy separately states that "Citi[bank] reserves the right to revise, amend, modify, or discontinue the Policy at any time in its sole discretion with 30 calendar days' written notice" by publishing any amendment in the employee handbook or by a "separate release to employees," with any such amendment effective 30 days after such notice. Arbitration Policy ¶ 26. In *Cheek*, the Maryland Supreme Court rejected an arbitration provision for lack of consideration where one party was "bound to arbitrate any disputes arising from the employment relationship," while the other party could "revoke the policy at any time, for any reason, without notice or consent." *Cheek*, 835 A.2d at 669. However, more recently, in *Holloman v. Circuit City Stores, Inc.*, 894 A.2d 547 (Md. 2006), the Maryland Supreme Court examined an arbitration agreement requiring an employer to "provide thirty-days notice prior to any modification" and which, unlike in *Cheek*, did not provide the employer with "unfettered discretion to alter or rescind the arbitration agreement without notice or consent." *Id.* at 554. Reasoning that the employer remained bound by the requirement to arbitrate during the 30-day notice period, such that the employee could require arbitration of any dispute arising prior to the amendment or rescission of the arbitration agreement, *Holloman* concluded that such terms were "adequate to create a binding obligation on [the employer] to submit to arbitration, such that [the employer's] promise to

arbitrate under the arbitration agreement constituted consideration, and the agreement is enforceable." *Id.* Where the amendment provision in Citibank's Arbitration Policy is substantially similar to that considered in *Holloman*, the Court finds that it does not alter the conclusion that the Arbitration Agreement was supported by consideration. Where the Court finds that the mutual agreement to arbitrate provided adequate consideration, it need not address Miller's other arguments regarding consideration.

## III.    Unconscionability

Miller further argues that the Arbitration Agreement is invalid because it is both procedurally and substantively unconscionable under Maryland law. The FAA "permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility, LLC v. Conception*, 563 U.S. 333, 339 (2011). "An unconscionable bargain or contract has been defined as one characterized by extreme unfairness, which is made evident by (1) one party's lack of meaningful choice, and (2) contractual terms that unreasonably favor the other party." *Walther v. Sovereign Bank*, 872 A.2d 735, 743 (Md. 2005) (citations omitted). The first form of extreme unfairness, the lack of meaningful choice, is referred to as procedural unconscionability; the second, terms that unreasonably favor one party, is referred to as substantive unconscionability. *See id.* at 744.

Miller primarily argues that the Arbitration Agreement was procedurally unconscionable because it was a "contract of adhesion," which is a contract "drafted unilaterally by the dominant party and then presented on a 'take it or leave it' basis to the weaker party who has no real opportunity to bargain about its terms." *See id.* at 746. Although Miller is correct that the

Arbitration Agreement was effectively a contract of adhesion, under Maryland law, "[a] contract of adhesion is not automatically deemed *per se* unconscionable." *Id.* In *Walther*, the court held that even if a contract is found to be a contract of adhesion, "that is not the end of the inquiry," and the court still "must examine the *substance* of the particular provision at issue . . . to decide whether it is unconscionable." *Id.* at 746-47. Notably, in that instance, the court found that an arbitration clause, even if deemed to be a contract of adhesion, was not invalid as unconscionable because of the lack of substantive unconscionability, in that the terms, which bound both parties to arbitrate certain disputes, were "not so unfairly oppressive as to make the agreement unconscionable." *Id.* at 748.

Here, although the Arbitration Agreement was a contract of adhesion, Miller has offered no further argument as to why the Arbitration Agreement's provisions are substantively unconscionable apart from the argument, addressed above, that it lacked consideration. Where the Court has concluded that the Arbitration Agreement was supported by adequate consideration, *see supra* part II, it does not have a basis to find that its terms were substantively unconscionable, which is necessary to invalidate a contract of adhesion as unconscionable. *See Walther*, 872 A.2d at 746-47. The Arbitration Agreement is therefore a valid and enforceable contract, and Miller is bound by its terms.

## IV.    FAA Exemption

Miller also argues that the Motion should be denied because employees in her former position as a bank manager are exempt from the enforcement of an arbitration agreement pursuant to the FAA. Under the FAA, arbitration agreements that must be enforced consist of those contained "in any maritime transaction or a contract evidencing a transaction involving commerce." 9 U.S.C. § 2. The FAA defines "commerce" in part as "commerce among the several

States or with foreign nations" but further states that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Miller argues that bank employees are a "class of workers engaged in foreign or interstate commerce," and therefore exempt from the FAA, because banks are "the very essence of commerce itself" and because Miller "regularly oversaw and facilitated the transfer of funds and assets across state and international borders." Opp'n at 13, ECF No. 30-1.

In *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001), the United States Supreme Court rejected an argument that retail sales counselors at Circuit City stores were "a class of workers engaged in foreign or interstate commerce" and held that the exemption addressed in § 1 is confined to "transportation workers," which consist of workers who, like the "seamen" and "railroad employees" specifically enumerated as excluded from the FAA, are actually "engaged in transportation" relating to "the free flow of goods." *Id.* at 110, 121. In *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783 (2022), the Supreme Court held that workers who loaded and unloaded cargo from airplanes fall within the category of "transportation workers" covered by this exemption but clarified that such workers "must at least play a direct and 'necessary role in the free flow of goods' across borders" or "must be actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." *Id.* at 1790 (quoting *Circuit City*, 532 U.S. at 121). Notably, the Court rejected an argument that all airline employees engaged in the customary work of an airline, rather than just the cargo loaders and those personnel who actually fly on the airplanes, constitute transportation workers within this definition. *Id.* at 1790-91.

11

*Circuit City* and *Southwest Airlines* foreclose Miller's argument.  Miller's claim that her duties as a bank manager involved the "transfer of funds and assets across state and international borders," Opp'n at 13, does not place her within the category of exempt "transportation workers" defined in § 1.  *See Circuit City*, 532 U.S. at 121.  Indeed, where they worked in companies that sold actual goods that traveled in interstate commerce, the workers in *Circuit City* deemed not covered by the exemption were closer than Citibank branch employees to the definition of transportation workers as having a "direct and necessary role in the free flow of goods across borders" or as "actively engaged in transportation of those goods across borders." *See Southwest Airlines*, 142 S. Ct. at 1790; *Circuit City*, 532 U.S. at 110, 121.  The general airline employees deemed to be outside of the exemption in *Southwest Airlines* are likewise far closer to falling within the exempt category of workers than bank employees.  *Southwest Airlines*, 142 S. Ct. at 1791.  The Court therefore finds that the exemption in § 1 of the FAA does not apply to Miller.

## V.      Dismissal

In the Motion, Citibank requests that if the Court compels arbitration, it should dismiss the case.  In contrast, Miller asks this Court to stay the action if the Court compels arbitration.  Under the FAA:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

9 U.S.C. § 3.  The United States Court of Appeals for the Fourth Circuit, however, has concluded that "[n]otwithstanding the terms of § 3 . . . dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." *Choice Hotels Int'l v. BSR Tropicana Resort*, 252 F.3d 707, 709-10 (4th Cir. 2001).

There is no serious dispute that all of Miller's claims are arbitrable.  On its terms, the Arbitration Agreement applies to "all employment-related disputes . . . between you and Citi[bank]" and "applies to both existing and future disputes, including disputes based on conduct that occurred before this Policy."  Arbitration Policy at 1, Mot. Dismiss Ex. B, ECF No. 27-3. Specifically,  the Arbitration Agreement applies to "claims, demands or actions under Title VII of the Civil Rights Act of 1964 . . . the Age Discrimination in Employment Act of 1967 . . . and any other federal, state or local statute, regulation or common-law doctrine regarding employment [and] . . . breach of contract . . . ."  *Id.* at 1-2.  Where Miller's claims are all based on causes of action specifically listed as covered by the Arbitration Agreement, the Court finds that they are all arbitrable.  Accordingly, the Court will dismiss the Complaint rather than stay the proceedings. *See Choice Hotels Int'l*, 252 F.3d at 709-10.

## CONCLUSION

For the foregoing reasons, Citibank's Amended Motion to Dismiss and Compel Arbitration will be GRANTED in that the Court will compel arbitration of all counts in the Complaint and dismiss this case.  A separate Order shall issue.

Date:   October 18, 2023

THEODORE D. CHUANG
United States District Judge

13